CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

July 02, 2026
LAURA A. AUSTIN, CLERK
BY: **/s/ Robin Bordwine**
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **ALLEN CEDRIC TAYLOR,** | ) | |
| Plaintiff, | ) | Civil Action No. 1:25cv00042 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **FRANK J. BISIGNANO,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant. | ) | United States Magistrate Judge |
| | ) | |

*I.    Background and Standard of Review*

Plaintiff, Allen Cedric Taylor, ("Taylor"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Taylor protectively filed his applications for DIB and SSI on September 1, 2021, alleging disability as of June 26, 2021, based on bipolar disorder, major depressive disorder and intermittent insomnia. (Record, ("R."), at 20, 200, 203-04, 210-17, 244.) The claims were denied initially and upon reconsideration. (R. at 108-25.) Taylor then requested a hearing before an administrative law judge, ("ALJ"). (R. at 126.) The ALJ held a hearing on July 12, 2024, at which Taylor was represented by a non-attorney representative. (R. at 41-68.)

By decision dated July 26, 2024, the ALJ denied Taylor's claims. (R. at 20-35.) The ALJ found Taylor met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2025. (R. at 22.) The ALJ found Taylor had not engaged in substantial gainful activity since June 26, 2021,[1] the alleged onset date. (R. at 22.) The ALJ determined that Taylor had a severe impairment, namely, bipolar affective disorder, but he found Taylor did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23-25.)

The ALJ found that Taylor had the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations: he could never be exposed to unprotected heights, such as ladders, ropes

---

[1] Therefore, Taylor must show he was disabled between June 26, 2021, the alleged onset date, and July 26, 2024, the date of the ALJ's decision, to be eligible for DIB and SSI benefits.

or scaffolds; he was limited to instructions and tasks that could be learned in 30 days or less; he could have no more than occasional changes in the work setting; he could not engage in production rate or pace work; and he could have no interaction with the public and no more than occasional interaction with co-workers and supervisors. (R. at 25.) The ALJ found Taylor had no past relevant work. (R. at 34.) Based on Taylor's age, education, work history, residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Taylor could perform, including the jobs of a laundry worker, a janitor and a hand packager. (R. at 34-35.) Thus, the ALJ concluded that Taylor was not under a disability as defined by the Act from the alleged onset date of June 26, 2021, through the date of the decision, and he was not eligible for DIB or SSI benefits. (R. at 35.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2025).

After the ALJ issued his decision, Taylor pursued his administrative appeals, (R. at 187-88), but the Appeals Council denied his request for review. (R. at 1-5.) Taylor then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2025). This case is before the court on Taylor's brief, filed October 27, 2025, the Commissioner's brief, filed December 23, 2025, and Taylor's reply brief, filed January 6, 2026.

## *II. Facts*

Taylor was born in 1959, (R. at 34), which, at the time of the alleged onset of disability, classified him as a "person of advanced age" who was closely approaching retirement age under 20 C.F.R. §§ 404.1563(d), 416.963(d). Taylor testified that he graduated from college, and he previously worked as a muralist. (R. at 46-47.) Taylor said he worked as a muralist from 2009 until 2021. (R. at 46-47.)

Taylor said he was arrested on January 6, 2021, for threatening a politician, which ultimately resulted in psychiatric hospitalization. (R. at 47.) Taylor said he lived alone, and he had been taking his mental health medications as prescribed for the previous nine months, but, before then, he was not regularly taking his medications. (R. at 48-50.) Taylor said that, despite taking medications and seeing a psychiatric nurse practitioner, he felt that he could not have a normal life. (R. at 50.) Taylor testified he had stolen truckloads of gravel in 2023 and was arrested twice for the theft. (R. at 57.) Taylor also testified that, a year previously, he burned down all the trees in his yard when he was manic. (R. at 60.) Taylor testified he was banned from the local library, the dentist's office and the YMCA because he had started arguments there. (R. at 60-61.) Taylor said working at home in his garden and feeding his dogs and chickens helped him to relax. (R. at 62.) Taylor said he had therapy every Monday, which helped to calm him down. (R. at 62.) Taylor testified he no longer painted after receiving electroconvulsive therapy, ("ECT"), treatments, because he had trouble concentrating. (R. at 63.) Taylor testified he had short-term memory problems, such as forgetting to turn the hose or stove burner off, and he had accidentally set part of his house on fire. (R. at 63.) Taylor testified he had problems with personal care, and when his water pump broke for five months, he did not wash his clothes or shower, and he drank rainwater out of buckets. (R. at 63-64.) Taylor testified he could not afford to fix his water pump because he had lost all of his money day trading stocks while manic. (R. at 64-65.)

In rendering his decision, the ALJ reviewed records from Carolina Center for Behavioral Health; Atrium Health; Carolina Orthopaedic Surgery Associates; Chad Ritterspach, Psy.D., a licensed psychologist; Saltville Medical Center; Emily Stacy, P.M.H.N.P., a psychiatric mental health nurse practitioner; Silvie Ward, Ph.D., a state agency psychologist; Dr. Robert McGuffin, Jr., M.D., a state agency physician; and Daniel Walter, Psy.D., a state agency psychologist.

Emily Stacy, P.M.H.N.P., Taylor's treating psychiatric mental health nurse practitioner, also testified at the hearing. (R. at 50-56.) Stacy testified she had treated Taylor since September 2023. (R. at 50.) Stacy testified that, due to Taylor's disorder, he was fearful of his medications, and he believed if he took them regularly, he would become depressed and catatonic, which had previously resulted in a psychiatric hospitalization because he was starving himself to death. (R. at 51-52.) Stacy testified that Taylor was volatile and aggressive, and he could not even go to the pharmacy without getting into altercations. (R. at 53-54.) Stacy testified that Taylor would never be able to consistently take his medications, and, therefore, she believed he would never get better. (R. at 54.) Stacy said, when she first met Taylor, he was manic, hypersexual, fearful and paranoid; he had pressured speech; he had flight of ideas; he was grandiose to the point of appearing narcissistic; he was intolerable of other peoples' views; and his judgment of his own mental illness was severely limited. (R. at 55.) Stacy said he avoided appointments because he was fearful of discussing his medications, and she did not believe he was capable of taking his medication regularly and consistently. (R. at 55.)

Alina Kurtanich, a vocational expert, also was present and testified at Taylor's hearing. (R. at 65-67.) Kurtanich testified, among other things, that a hypothetical individual of Taylor's age and education, with no past relevant work, who could perform work at any exertional level, but who could not be exposed to unprotected heights such as ladders, ropes or scaffolds; who was limited to instructions and tasks that could be learned in 30 days or less; who could have no more than occasional changes in the work setting; who could not perform production rate or pace work, such as an assembly line or having strict hourly quotas; who could have no interaction with the public and no more than occasional interaction with co-workers and supervisors, could perform jobs existing in significant numbers in the national economy, such as a laundry worker, a janitor and a hand packager. (R. at 65-66.)

Kurtanich testified that the same individual, but who could not maintain regular attendance, who needed special supervision, who could not get along with the public, who could not ask for assistance, who could not respond to criticism, who could not get along with co-workers and who could not tolerate normal levels of stress, would be unable to work. (R. at 66.)

Taylor was hospitalized at The Carolina Center for Behavioral Health from February 20, 2021, to March 12, 2021. (R. at 360.) Taylor reported he was last hospitalized in 2020 and discharged after he improved with ECT and medication. (R. at 363.) On February 20, 2021, Taylor reported receiving trazodone and Effexor during his most recent hospitalization, which he had run out of a couple months previously. (R. at 363.) Taylor reported stress over politics, irritability to the point of anger and chronic sleep difficulties. (R. at 363.) He reported frequent verbal altercations with friends. (R. at 363.) Taylor reported recently spending 10 days in jail after he threatened a senator. (R. at 363.) On mental status examination, Taylor was dressed casually; he was in no acute distress; he was fully oriented; his affect was irritable to excited; he was angry; he had psychomotor agitation; he had mostly linear thought content and cognition, though he could be circumstantial, tangential and difficult to interrupt; he had no hallucinations; his memory was normal; he was alert; his judgment and insight were poor; he was able to perform activities of daily living; and he had no homicidal or suicidal ideations. (R. at 363-64.) Taylor was restarted on trazodone, and he was prescribed Zyprexa. (R. at 364.) A drug test conducted that day was negative for all substances. (R. at 365-66.)

On Taylor's March 12, 2021, discharge summary, Taylor was reported to be reaching his baseline of physical, mental and social functioning. (R. at 362.) On mental status examination, Taylor was pleasant and cooperative; he had no suicidal or homicidal thoughts; he had no hallucinations or paranoia; he had grandiosity, but

no actual delusions, and he was less paranoid about politics; and his insight and judgment were better. (R. at 361-62.) Discussing Taylor's hospital course, Dr. Mohammed Memon, M.D., a psychiatrist, stated:

> I discussed with [Taylor] about options of ECT since it has helped him before for severe depression and bipolar illness. [Taylor] agreed and will be started on ECT treatment, but also started him on Abilify for his paranoia and for bipolar illness. [Taylor] at first was somewhat reluctant to take medications because he believes that medications are not needed[,] when I explained that he got in legal trouble because of his bipolar illness and[,] that if he does not get it effectively treated, he can get in trouble again and it could be dangerous for him. He may end up in prison. [Taylor] agreed to take medication after he started trusting me more and more after communication every day, [and] I started him on Abilify 5mg [which] was increased to 7.5, later it was increased to 10mg. [Taylor] was given Desyrel for insomnia. He was also given Vistaril for p.r.n. use and Ativan for [as needed] use [] in case [] he gets agitated. [He] did get frequent agitation and verbal aggression against some of the staff members several times … [and he] had [a] lot of narcissistic behaviors[.] … [He] is very grandiose at times when he talks about his hard work [and says] he is very intelligent and other people are not intelligent[.] … [Taylor] is terrified that he will end up in jail … and he is willing to go on maintenance ECT … after the [sixth] treatment today[.]

(R. at 361.)

On December 22, 2021, Taylor saw Dr. Matthew Schwartz, M.D., a surgeon, with complaints of left shoulder pain that had lasted more than a year. (R. at 564.) On examination, Taylor's left shoulder had reduced strength, range of motion and nerve impingement. (R. at 566.) He was cooperative, had an appropriate mood and affect and normal judgment. (R. at 566.) X-rays of the left shoulder showed mild degenerative changes, and Dr. Schwartz ordered magnetic resonance imaging, ("MRI"), to rule out a rotator cuff tear. (R. at 566.)

On October 11, 2022, Taylor saw Chad Ritterspach, Psy.D., for a psychological evaluation in connection to his disability claims. (R. at 675-78.) Taylor reported struggling with depression since he was a teenager, and his first manic episode was in college. (R. at 675.) He said he had been on depression medication since 1993, and he had tried mood stabilizers in the prior five years, but he stopped taking them because he had a bad reaction. (R. at 675.) He said he was most recently manic and currently was taking Effexor, which was moderately effective. (R. at 675.) He said he had two rounds of ECT and had been psychiatrically hospitalized four times, and, currently, he was treatment compliant. (R. at 675.) Taylor reported that he had previously worked as an artist, but was let go from his most recent job because he was unstable, moody and would yell at his employer. (R. at 675.) Taylor reported having been terminated from several jobs due to mood-related problems. (R. at 675.) Taylor reported his psychiatric symptoms caused him to break down at work, cuss people out, shift blame and have problems with absenteeism. (R. at 675.) Taylor denied problems remembering instructions and indicated he could maintain concentration and manage workplace hazards. (R. at 675.) Taylor reported intermittently struggling with alcohol. (R. at 675.) Taylor said he had recently lost money in the stock market during a manic episode. (R. at 675.) Taylor said he walked his dogs, read the news and cared for his property. (R. at 676.) He could not watch television because he became too angry. (R. at 676.) He said he completed self-care independently and had a system for managing his medications and appointments. (R. at 676.) He reported completing his chores except when he was very depressed or manic. (R. at 676.) He said he had no trouble remembering instructions or conversations except when very manic. (R. at 676.) He prepared simple foods and cooked with a microwave. (R. at 676.) He had a valid driver's license and drove when necessary. (R. at 676.) He could shop, but could not manage money. (R. at 676.) He was not interested in interacting with others and spent much of the day alone to avoid being irritable. (R. at 676.)

On mental status examination, Taylor had good hygiene and grooming; his posture and gait were within normal limits; his demeanor was pleasant and engaged; he did not exaggerate and was not evasive; he was an accurate historian; he made appropriate eye contact; his speech was articulate and normal in volume; the pace of his speech was pressured; he rambled; his mood and affect were mildly depressed, which was consistent with thought content and situation; he had no signs of homicidal or suicidal intent; his thought processes were logical and goal-directed; he had no signs of psychosis; his past vocational and academic functioning was average; he had mild issues with concentration and attention; his recall of past and present events was within normal limits; he had no significant cognitive impairment; he answered questions accurately and without pauses; and he displayed good effort. (R. at 676.) Ritterspach diagnosed Taylor with bipolar disorder, most recent episode manic; and rule out alcohol use disorder. (R. at 676.) In his Clinical Functional Assessment, Ritterspach found that Taylor was moderately impaired in his ability to complete activities of daily living. (R. at 676.) Specifically, Ritterspach noted Taylor's depression interfered with his motivation, and irritability impaired his ability to complete chores that required interactions with the public, but he could identify and manage workplace dangers. (R. at 676.) Ritterspach found Taylor was significantly impaired in the area of social functioning, noting he was irritable around others and generally avoided social situations; he was able to participate appropriately in the consultative examination without anxiety, although he had mild mania; he had good social skills unless angered; in the workplace, he would have an intermittently impaired ability to interact appropriately with co-workers and supervisors; due to irritability and depression, he should not work with the public and would likely do best in jobs that did not require interacting much with others. (R. at 676.) Ritterspach also found that Taylor was moderately impaired in the area of concentration, persistence and pace, noting that Taylor displayed good verbal reasoning and math skills; he could understand, retain and follow semi-detailed

instructions; but due to irritability, mania and depression, he would have problems tolerating work stress, which would cause intermittent difficulty sustaining focus on tasks; and he could generally complete tasks on time, but he would be impaired from doing so during episodes of mania and depression. (R. at 676.) Lastly, Ritterspach opined Taylor would need help in making financial decisions due to mania-related mismanagement. (R. at 676.)

Silvie Ward, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), in connection with the initial determination of Taylor's claims, on October 17, 2022. (R. at 73-75.) She opined Taylor was mildly limited in his ability to understand, remember or apply information and to adapt or manage himself; and he was moderately limited in his ability to interact with others and to concentrate, persist or maintain pace. (R. at 74.) Ward concluded that Taylor could perform simple, repetitive tasks in a setting not requiring frequent public contact. (R. at 74.) Ward also completed a Mental Residual Functional Capacity assessment of Taylor, opining he was moderately limited in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 76-77.) Ward opined Taylor could remember location and work-like procedures; understand, remember and carry out very short and simple instructions; understand and remember semi-detailed instructions; attend to and perform simple tasks without special supervision for at least two-hour periods; understand normal work hour requirements and be prompt within reasonable limits; make simple work-related decisions; satisfactorily complete a normal workday/workweek without an unreasonable number of rest or cooling off periods; ask simple questions and request

assistance from peers or supervisors; sustain socially appropriate work behavior, standards and appearance; respond appropriately to changes in a routine setting; be aware of personal safety and avoid work hazards; travel to and from work using available transportation; and set goals.  (R. at 77.)

On August 10, 2023, Taylor saw Michael Murray, F.N.P.-B.C., a nurse practitioner, to establish care. (R. at 684.) Taylor reported a history of depression, stating he had been taking Effexor and trazodone. (R. at 684.) Taylor said he had not been taking Abilify or Seroquel regularly. (R. at 684.) He denied suicidal or homicidal thoughts. (R. at 684.) Taylor said he would be going to court soon because he stole gravel from a company, and he felt that the theft was self-sabotage because he knew he should not have stolen the gravel. (R. at 684.) A depression screening indicated moderate depression. (R. at 684.) Taylor reported acting "goofy" because he had not taken his medications for the last few weeks. (R. at 684.) On mental status examination, Taylor had good eye contact; he was fully oriented; it was hard for him to stay on topic, and he had to be redirected; and he had grandiose ideation. (R. at 685.) Murray diagnosed a moderate episode of major depressive disorder and refilled Taylor's medications. (R. at 686.)

On August 17, 2023, Taylor saw Richard Bare, a social work supervisee, for a behavioral health assessment. (R. at 679.) A depression screening was conducted and indicated Taylor was moderately depressed. (R. at 679.) Taylor indicated he would like to participate in monthly therapy to alleviate his depression symptoms. (R. at 679.) He said he took Effexor, Seroquel and trazodone. (R. at 679.) Taylor denied using all illegal drugs, alcohol, caffeine and nicotine. (R. at 679-81.)

Daniel Walter, Psy.D., a state agency psychologist, completed a PRTF in connection with the reconsideration of Taylor's claims, on August 31, 2023. (R. at

92.) Walter opined Taylor was mildly limited in his ability to understand, remember or apply information; to interact with others; and to adapt or manage himself; and moderately limited in his ability to concentrate, persist or maintain pace. (R. at 92.) He concluded, like state agency psychologist Ward, that Taylor could perform simple, repetitive tasks. (R. at 92.) Walter also completed a Mental Residual Functional Capacity assessment of Taylor, opining he was moderately limited in his ability to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 94-95.) Walter concluded that Taylor could carry out very short and simple, one- to two-step instructions; and simple and repetitive tasks required to meet the basic demands of competitive work. (R. at 94.)

On September 14, 2023, Taylor saw Stacy, a psychiatric mental health nurse practitioner, to establish care. (R. at 691.) Depression and anxiety screenings indicated minimal depression and no anxiety. (R. at 691.) Taylor reported a previous psychiatric hospitalization in 2019 where he became catatonic and was taken to the hospital by his landlord. (R. at 692.) Taylor said his second hospitalization was in 2021 after threatening a senator. (R. at 692.) Taylor said he had received ECT treatment in 2019 and 2021. (R. at 692.) Taylor reported a history of bipolar disorder and currently was exhibiting symptoms of hypomania, including an elevated mental state; he was hyperverbose and difficult to interrupt; he was engaging in risky and impulsive behavior; he was irritable and at times angry; but he did not report problems sleeping and was eating well. (R. at 692.) Stacy noted that Taylor was paranoid at times and frequently interrupted her with narcissistic interjections. (R. at 692.) He endorsed taking his medications, although Stacy doubted his claim. (R. at

692.) Taylor endorsed depression and suicidal ideation beginning at age 11. (R. at 692.) He reported graduating from Appalachian State University. (R. at 692.) Taylor said he was sleeping well, he had a good appetite, he had energy, motivation and interest, he denied suicidal and homicidal ideation, and he denied auditory and visual hallucinations. (R. at 692.) Taylor endorsed feeling dread and said he had nightmares and intrusive memories. (R. at 692.) Taylor said in previous manic episodes he lost a lot of money trading stocks, but he felt that mania was a big part of his life and helped him creatively. (R. at 692.) He said he felt no empathy for others when he was manic. (R. at 692.) Stacy increased Taylor's Seroquel, continued his Effexor and added Lamictal. (R. at 693.) She noted Taylor likely would have issues with medication compliance, and she recommended he follow up with a psychiatrist at his local community services board for more comprehensive care. (R. at 693.)

On mental status examination, Taylor was cooperative with good hygiene; he made appropriate eye contact, with no abnormal movements or tremors noted; his behavior was inappropriate, such as asking the nurse to walk on his back; his speech was verbose and loud, with inappropriate laughter; he had racing thoughts, but no thought blocking or flight of ideas; he exhibited no symptoms of psychotic process; he denied suicidal and homicidal ideation; he denied hallucinations; he was fully oriented; he was distractable; he described his mood as "good, situations can bring the depression"; his affect was grandiose, narcissistic and hypomanic; he reported having good memory, but later reported having problems with memory; his fund of knowledge was average; he had fair insight into his illness; and his judgment appeared appropriate for everyday matters. (R. at 696-97.) Stacy diagnosed bipolar affective disorder, current episode hypomanic. (R. at 697.)

Taylor saw Stacy for a telehealth appointment on October 12, 2023. (R. at 701.) Depression and anxiety screenings indicated moderate depression and mild anxiety. (R. at 701-02.) Regarding Taylor's medication, Stacy noted:

> Today … [Taylor] reports he was unable to pick up his medication because it was not available at the pharmacy. However, review of prescription records shows Lamictal was sent to his pharmacy on the day of his last visit. Discussed [medication compliance drug screening] completed last visit was negative for Seroquel and Trazodone. [Taylor] insists he is taking the medications. He is being prosecuted for taking gravel "again" relates he took gravel from a public site "5 or 6 times[.]" ["It's] a mania decision[."] "I took a couple of loads of gravel[."]
>
> Discussed his Bipolar mania symptoms are not controlled and strongly emphasized the need to resume his medications. Reiterated that choosing not to take medications would lead to further impulsive decisions with possible grave consequences. At this point [Taylor] became very angry, yelling accusatory remarks [such as] "the medicine wasn't there" [and] "I'm taking the medicine" [and] "you didn't tell Mr. Bare why I missed my appointment[."] [Taylor] began discussing difficulties he has controlling his temper with WalMart pharmacy employees. Eventually [Taylor] was able to calm himself and apologize.

(R. at 703.)

Taylor also reported severe financial difficulties, stating he was going through bankruptcy and could not always afford to feed his dogs. (R. at 703.) Stacy continued Taylor's medications, and he agreed to have them mailed to his home. (R. at 703-04.) During mental status examination, Taylor was alert and cooperative, with good hygiene; he had appropriate eye contact; no abnormal movements or tremors were noted; his speech was loud, angry and volatile at times; he was difficult to interrupt and had inappropriate laughter and coherence; he had racing thoughts, but no thought blocking or flight or ideas; there was no evidence of psychotic process, and

he denied suicidal and homicidal ideation; he was fully alert and oriented; he was distractible; he described his mood as "more depressed"; his affect was grandiose, narcissistic and hypomanic, and he was angry and volatile; he reported his mind was "like a steel trap," but later reported problems with memory; his fund of knowledge was average; he had fair insight into his illness; and his judgment appeared appropriate for everyday matters. (R. at 705.) Stacy assessed Taylor with treatment noncompliance and bipolar affective disorder, current episode hypomanic. (R. at 705-06.) She continued Taylor's medications. (R. at 706.)

When Taylor saw Stacy on October 26, 2023, depression and anxiety screenings were negative. (R. at 708.) Taylor reported anger after he was denied social security disability, but said he felt relieved the process was over. (R. at 710.) Taylor expressed anger related to his political views, but found relief in talking to his providers. (R. at 710.) He said Seroquel gave him vivid dreams, and Lamictal had not made him sleepy or stifled his creativity. (R. at 710.) He said he had been sleeping well and had many nonperishable food items from the pandemic. (R. at 710.) During mental status examination, Taylor was alert and cooperative with good hygiene; he made appropriate eye contact, and no abnormal movements or tremors were noted; his speech was loud and angry at times, with inappropriate laughter; he had racing thoughts, but no thought blocking or flight of ideas; there was no evidence of psychotic process; he denied suicidal and homicidal ideation; he denied hallucinations; he was fully oriented; he was distractible; he described his mood as angry; his affect was grandiose, narcissistic and hypomanic; he reported having a mind "like a steel trap," but later reported memory problems; he had an average fund of knowledge; he had improved insight into his illness; and his judgment appeared appropriate for everyday matters. (R. at 712-13.) Taylor's diagnoses remained the same, and his Lamictal and Seroquel dosages were increased. (R. at 713.)

On November 22, 2023, Taylor had a telehealth appointment with Stacy. (R. at 715.) Depression and anxiety screenings were negative. (R. at 715.) He reported burning brush, and the fire "got out of control," but he "prayed and was allowed to put the fire out." (R. at 717.) He said he was unaware there was a burn ban, but when the police came to his property, he was calm and did not get a ticket. (R. at 717.) He reported that he was taking less of his medications than prescribed, and Stacy "[r]eiterated at length the need to follow clinical instructions in regards to his medication dosing." (R. at 717.) Taylor said his monthly therapy was beneficial to him. (R. at 717.) During mental status examination, Taylor was alert and cooperative; he made appropriate eye contact, and no abnormal movements or tremors were noted; his speech was normal in rate and volume; he had no thought blocking or flight of ideas; there was no evidence of psychotic process; he denied suicidal and homicidal ideation; he was preoccupied with religion; he was fully oriented; his attention and concentration were good; he described his mood as "I've never had this much peace in all my life;" his affect was appropriately interactive; he had no obvious memory deficits; his fund of knowledge was average; he had improved insight into his illness; and his judgment appeared appropriate for everyday matters. (R. at 718-19.) Stacy again diagnosed him with noncompliance with treatment and bipolar affective disorder, current episode hypomanic. (R. at 719.)  She continued Taylor's medications.  (R. at 719.)

On January 4, 2024, Taylor saw Stacy for a telehealth appointment. (R. at 721.) Depression and anxiety screenings indicated moderately severe depression and mild anxiety. (R. at 721-22.) Taylor said he felt good, and he knew he needed to take his medication because of the fire. (R. at 723.) He reported borrowing money from a loan website after losing $2,000.00 in the stock market over the prior two months, resulting in financial difficulties. (R. at 723.) He reported being unable to pay his landlord and pay for dog food. (R. at 723.) He said Seroquel was no longer helping,

and he agreed to try Risperdal. (R. at 723.) During mental status examination, Taylor was alert and cooperative; he made appropriate eye contact, and no abnormal movements or tremors were noted; his speech was a normal rate and volume; he had no thought blocking or flight of ideas; there was no evidence of psychotic process; he denied suicidal and homicidal ideation; he denied hallucinations; he was preoccupied with religion; he was fully oriented; his attention and concentration were normal; he said his mood was good; he was appropriately interactive; there were no obvious memory deficits; his fund of knowledge was average; he had improved insight; and his judgment was appropriate for everyday matters. (R. at 726.) Taylor's diagnoses were unchanged, and Stacy increased his Lamictal dosage. (R. at 724, 726.)

On February 1, 2024, Taylor saw Stacy for a telehealth appointment. (R. at 729.) Depression and anxiety screenings indicated moderate anxiety and mild depression. (R. at 729-30.) Taylor reported not receiving the Risperdal and failing to inform the clinic. (R. at 731.) Instead, he continued taking between "a half and a full pill" of Seroquel. (R. at 731.) Taylor reported having no money for his medications because he had lost money in an "online loan scam." (R. at 731.) Mental status examination was the same as the previous month, except he was verbose and loud at times; and he described his mood as "manic," but Stacy noted he was calmer on a mood stabilizer. (R. at 734.)

Taylor saw Bare weekly from February through June 2024. During this time, Taylor's behavior was congruent with mood and situation; his insight was appropriate; his mood was depressed, and his affect was anxious; his speech was normal; his thought process was coherent; he had no significant memory problems; he was fully oriented; and he had no suicidal or homicidal ideation or psychosis. (R. at 741, 743-60, 762-63, 774, 777, 783, 794.) During this time, Taylor generally

reported he was doing well, aside from one appointment where he reported losing a lot of money in the stock market. (R. at 740, 743, 745, 748, 750, 752, 753, 755, 757, 759, 762, 793.)

On May 9, 2024, when Taylor saw Stacy, anxiety and depression screenings indicated severe anxiety and mild depression. (R. at 765.) Taylor reported taking Lamictal, Effexor and Risperdal and felt they worked well. (R. at 767.) During mental status examination, Taylor was alert and cooperative; he was verbose and loud at times; he had no thought blocking or flight of ideas; there was no evidence of psychotic processes; he denied suicidal and homicidal ideation; he was religiously preoccupied and paranoid; he was fully oriented; attention and concentration were intact; his affect was loud, angry and inappropriately interactive at times; he had no obvious memory deficits; his fund of knowledge was average; he had improved insight into his illness; and his judgment appeared appropriate. (R. at 770.) When Taylor saw Stacy on June 12, 2024, his mental status examination was largely unchanged, and depression and anxiety screening indicated moderate depression and mild anxiety. (R. at 785, 790.) Stacy diagnosed bipolar affective disorder, current episode hypomanic; current moderate episode of major depressive disorder, unspecified whether recurrent; and treatment noncompliance. (R. at 790.) She continued Taylor's medications. (R. at 791.)

On July 10, 2024, Stacy completed a Mental Residual Functional Capacity Assessment of Taylor. (R. at 797-800.) Stacy listed Taylor's current diagnoses as bipolar I disorder, most recent episode hypomanic/manic; rule out schizoaffective disorder; rule out antisocial personality disorder or other personality disorder. (R. at 797.) Stacy opined Taylor's prognosis was poor, stating he "will likely continue with symptoms to include problematic/impulsive behavior." (R. at 797.) Stacy opined Taylor's impairment lasted, or was expected to last, at least 12 months, and she did

not believe he was malingering. (R. at 797.) Stacy opined Taylor refused to be compliant with medications and at times misused his medication by taking more than prescribed to calm himself. (R. at 798.) Stacy opined Taylor had no limitations in his ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to understand and  remember detailed instructions; to carry out very short and simple instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to make simple work-related decisions; to be aware of normal hazards and take appropriate precautions; and to set realistic goals or make plans independently of others. (R. at 798-800.) Stacy opined Taylor had extreme limitations, defined as the inability to function in an area, in his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to travel in unfamiliar places or use public transportation; and to tolerate normal levels of stress. (798-800.) Stacy opined Taylor's mental health impairments would cause him to miss work 15 to 20 days per month. (R. at 800.) Stacy opined Taylor could not work on a regular and sustained basis, stating that his "chronic mental illness manifests frequently as grandiosity, verbosity [and] excessive involvement in activities that have high potential for painful consequences … and explosive anger with threatening behavior, making him

at risk for injuring others or … being injured." (R. at 800.) Lastly, she opined Taylor could not manage his own funds due to a history of poor money management and financial losses that previously resulted in housing and food insecurity. (R. at 800.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2025). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2025).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A). 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Taylor argues that the ALJ's decision, and, specifically, his residual functional capacity finding, are not based on substantial evidence. (Plaintiff's Social Security Brief, ("Plaintiff's Brief") at 11-15.) In particular, Taylor argues that the ALJ failed to address the "consistency" of Stacy's medical opinion, as required by the regulations. (Plaintiff's Brief at 10.)

Taylor filed his applications in September 2021; thus, 20 C.F.R. §§ 404.1520c, 416.920c govern how the ALJ considered the medical opinions here.[2] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2025). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. §§

---

[2] 20 C.F.R. §§ 404.1520c, 416.920c apply to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2025). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2025).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2025). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The ALJ analyzed Stacy's opinion, finding it "not very persuasive:"

The opinion seems partially supported in that the provider appropriately considered the claimant's subjective complaints, which are also reflected in the provider's treatment notes prior to the date of the opinion. … The undersigned has considered these complaints in determining the claimant's residual functional capacity. However, the opinion is inconsistent with other evidence because the suggested

degree of limitation appears overstated and cites impairments not found in the medical record. For example, … Stacy refers to the claimant's symptoms being uncontrolled, and he was not [compliant] with medication, but her own records note the claimant reported his symptoms were improved with medication and he was more compliant with medication once the medication was delivered to his home. … Additionally, … Stacy testified to extreme anger outbursts and incidents in public that are not noted in the medical record. Accordingly, the opinion from the claimant's own provider is not very persuasive.

(R. at 33-34.)

Taylor argues that the ALJ addressed only the supportability of Stacy's medical opinion, not the consistency. As stated above, the ALJ is required to consider the extent to which the opinion is consistent "with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). I agree with Taylor. The ALJ did not adequately articulate an evaluation of the consistency of Stacy's opinion "with the evidence from other medical sources and nonmedical sources in [this] claim." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). While the ALJ's decision states that Stacy's "opinion is inconsistent with other evidence because the suggested degree of limitation appears overstated and cites impairments not found in the medical record," the ALJ does not complete the analysis by citing other conflicting evidence in the record and, instead, refers only to Stacy's own records – which would address the *supportability* of her opinion.  (R. at 33.) Continuing his analysis, the ALJ states Stacy "testified to extreme anger outburst and incidents in public that are not noted in the medical record," but this finding is not supported by substantial evidence. (R. at 33-34.) For example, Taylor was involuntarily hospitalized in March 2021 for threatening to kill a senator; he told Ritterspach he had a history of conflict with coworkers and supervisors, and he would cuss them out; Stacy reported Taylor was

unable to retrieve his medications from the pharmacy due to difficulties controlling his temper with the employees; and Stacy noted that Taylor had lost his temper with her *during a medical appointment*. (R. at 360, 675, 703.) Additionally, Taylor testified in the hearing that he was banned from his local library for starting an argument that resulted in the police being called; he was banned from his dentist's office for breaking a machine; he was banned from two different YMCAs due to incidents resulting in the police being called; and he has been banned from camping areas. (R. at 60-61.) The ALJ's cursory analysis does not build a logical bridge between the evidence and the ALJ's conclusion, frustrating meaningful judicial review and requiring remand. *See Monroe v. Colvin*, 826 F.3d 176, 189, 191 (4th Cir. 2016) (ALJ's failure to "build an accurate and logical bridge from the evidence to his conclusion" constitutes reversible error).

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's consideration of Stacy's medical opinion;
2. Substantial evidence does not exist in the record to support the ALJ's residual functional capacity finding; and
3. Substantial evidence does not exist in the record to support the ALJ's finding that Taylor was not disabled.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court vacate the final decision of the Commissioner denying benefits and remand this case to the Commissioner for further development.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    July 2, 2026.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE